DIXON, Chief Justice.
This controversy involves a dispute over the correct freight charges for certain shipments of scrap iron and steel over a wholly intrastate route.
On December 27, 1978, Luria Brothers & Company, Inc. filed a complaint with the Louisiana Public Service Commission challenging the freight charges imposed by the carriers. Luria alleged that the railroads improperly computed the rates by figuring in increases in the interstate rate which had not yet been approved by the LSPC with a letter-number supplement. The LPSC sustained Luria’s complaint in Order No. T-14090 with this statement:
“... The carriers have published ex parte items in their tariffs showing how these increases are to be applied.

The railroads are required to assess charges in accordance with their tariffs on file with the Commission and, in view of the evidence present in the record after hearing of the matter, it is ORDERED that the complaint is sustained.”
The Commission pointed out that by the language of the tariffs themselves, the increases will not apply on intrastate traffic “until authorized by letter-number (e.g., K-l, K-2, etc.) supplements.... ”
Pursuant to R.S. 45:1192,[1] the railroads petitioned the Nineteenth Judicial District *1120 Court for review of the LPSC’s ruling. Luria intervened in the suit as a party defendant. The district court upheld the ruling of the Commission, finding no abuse of authority. An appeal to this court was then perfected by the carriers. See Art. 4, § 21(E) La.Const.1974; Louisiana Power & Light Co. v. Louisiana Public Service Commission, 369 So.2d 1054 (La.1979).
The parties stipulated to the following facts at the hearing before the Commission:
During February, March, April and May, 1977, the Missouri Pacific Railroad Company and the Louisiana & Arkansas Railway Company transported 104 carloads of scrap iron and steel from Avondale, Louisiana to Shreveport, Louisiana for Luria. The railroads billed Luria at a rate of $12.96 per Net Ton, calculated according to Southwestern Lines Tariff Bureau 2004-J, ICC 5160, Supplement 85, Item 13050-E, Commodity Rate Column 169 (tariff SW 2004-J). The rate took into account ex parte increases as of the date those increases became effective for interstate transportation even though the increases had not yet received letter-number supplements by the Louisiana Public Service Commission.[2] Luria paid the freight charges on these shipments under protest, claiming an overcharge of $8129.01. The L & A refunded $1129.98 (because of an error in the weight of the shipments), leaving a sum of $6999.03 allegedly due Luria. An additional 286 carloads of scrap iron and steel were shipped for Luria from Avondale to Shreveport between May, 1977 and October, 1978. Luria paid an amount lower than that charged by L & A, computing the freight rate on the base tariff plus only those ex parte increases which had been approved by the LPSC with letter-number supplements.[3] L & A claimed a balance due of $16,413.32.
J. S. McAndrew, the general traffic manager for Luria, testified that language in tariff SW 2004-J states that the ex parte increases will not take effect on intrastate movements until authorized by state regulatory bodies as letter-number supplements. Their interpretation of the tariff was that the master tariff level would continue to govern with regard to intrastate shipments until the local agency sanctioned the increases.
Luria also introduced into evidence an order by the LPSC on May 25, 1979 in a matter entitled Georgia Pacific Railroad Company v. Missouri Pacific Railroad Company and Illinois Central Gulf Railroad, T-14112. In that case, the complainant alleged that the carriers were charging rates in excess of the allowable rate under the filed tariffs. The Commission sustained the complaint, citing rule 55-h. The LPSC observed that the ex parte items in the tariffs are often made effective several months before the filing or effective date of similar intrastate increases. As in the instant case, the LPSC refused to allow the railroads to impose the higher rate until it had been approved for intrastate traffic.
In order to understand the issue in this case, a discussion of the formulation of rates for common carriers is necessary. *1121 The allowable freight charges for shipments carried by the railroads are published in tariffs. The railroads propose rates to the ICC; if the ICC adopts the carriers’ proposals, the rates are set forth in tariffs. Tariff SW 2004-J contains commodity rates for goods shipped in interstate commerce. Periodically, the railroads seek an increase in the tariff levels from the ICC. After a hearing, the ICC will decide whether to approve the recommended increase. If it is approved, the increase, termed “ex parte increase_” (e.g., X 343), will become the effective rate for interstate transportation. The carriers may then petition the appropriate state regulatory body to apply this increase to intrastate rates. If the increase is approved, a “letter-number supplement” is issued by the state agency. In the present case, certain ex parte increases, approved by the ICC, had not yet been published on the date of the contested shipments.[4]
The railroads argue that there is only one interstate rate on any given day and that it is figured as the base level plus all ex parte increases, whether or not the increases have been adopted by the LPSC in letter-number supplements. It is their contention that the LPSC’s ruling effectively creates three rates: the intrastate rate, the true interstate rate (base rate plus all ex parte increases), and another interstate rate made up of the base rate plus ex parte increases approved by the LPSC in letter-number supplements. It is suggested that the purpose of rule 55-h is to insure parity between interstate and intrastate shippers. By allowing intrastate shippers the benefit of the lower interstate rate, the rule insures that the intrastate shipper will pay only the same rate as the interstate shipper.[5] The railroads urge that this policy will be violated if the ex parte increases approved by the ICC are not considered in arriving at the interstate rate, and that not including the increases results in greater disparity between the higher intrastate rate and the already lower interstate rate.
On the other hand, Luria and the LPSC contend that language in the tariff indicates that the correct interstate rate for purposes of rule 55-h is composed of the base level plus those ex parte increases approved by the LPSC in letter-number supplements. Moreover, the shipper asserts that an exception printed in each ex parte increase, put there by the railroads themselves, unequivocally states that the ex parte increases will not be considered in setting intrastate rates until implemented by the letter-number supplements. Luria points out that it is the responsibility of the carriers to petition the Commission for ex parte increases. To allow the carriers the *1122 benefit of the increases immediately upon approval of the ICC would circumvent the function of the LPSC to sanction those increases for intrastate traffic.
To compute intrastate rates, rule 55-h, promulgated by the LPSC pursuant to its constitutional grant in Art. 4, § 21(B) La. Const.1974, provides:
“... where two or more freight rates on the same commodity apply for intrastate application, except on petroleum and its products, between points in the State of Louisiana, the lower rate shall in all instances be applied for intrastate applica-tion_” Order 57, August 27, 1922.
The parties stipulated that the interstate rate was lower at all pertinent times than the corresponding intrastate rate. Thus, under rule 55-h, the interstate rate would apply to the shipments; the question becomes a determination of the correct interstate rate on the date of shipment.
Item 650 explains application of the tariff to intrastate traffic:
“Except where expressly provided to the contrary in individual items or in connection with particular rates, this tariff applies on intrastate traffic only in the States of Arkansas, Louisiana (Notes 1 and 2), Missouri, New Mexico and Oklahoma.
This tariff does not apply on Texas intrastate traffic.
NOTE 1 — Rates and charges determined by use of ‘Commodity Rate Column’ published in this tariff have application on Louisiana intrastate traffic only when interstate rates or charges are observed as a maximum on Louisiana intrastate traffic in accordance with terms of Rule 55(h) of the Louisiana Public Service Commission.
NOTE 2 — Rates apply not subject to Louisiana Public Service Commission Rules 60a, 64a and 64b.”
In all pertinent ex parte increases, the following exception is found:
“EXCEPTION 1 — The provisions of this item will NOT apply: (Note 1)
(a) On Intrastate traffic moving between points in and transported wholly within any State, nor to rates or charges on intrastate traffic ... until authorized by letter-number (e.g., K-l, K-2, etc.) supplements to Tariff of Increased Rates and Charges X-330, referred to above, which shall specify the increases applicable to such rates and charges, and which shall be filed with the Interstate Commerce Commission and State Commissions. NOTE 1 — Reference to Item 20255 formerly shown and not brought forward herein is hereby eliminated; no application.
EXCEPTION 2 — The provisions of this item will not apply on rates in Part 2 of Item 19800.”
An order of the Commission will not be overturned unless it is shown to be arbitrary, capricious or abusive of its authority. While a decision of the Commission may be deemed arbitrary unless supported by some factual evidence, when there is some evidence upon which the Commission could reasonably base its determination, this court will not upset the Commission’s ruling. Central Louisiana Electric Co. v. Louisiana Public Service Commission, 370 So.2d 497 (La.1979); South Louisiana Electric Cooperative Assn. v. Louisiana Public Service Commission, 367 So.2d 855 (La.1979); Truck Service, Inc. v. Louisiana Public Service Commission, 263 La. 588, 268 So.2d 666 (1972). Upon judicial review a court will not disturb orders such as the one in this case unless after looking at the evidence it concludes that the Commission’s action was arbitrary, capricious and a clear abuse of its power. Dreher Contracting & Equipment Rental v. Louisiana Public Service Commission, 396 So.2d 1265 (La.1981); Hearin Tank Lines, Inc. v. Louisiana Public Service Commission, 247 La. 826, 174 So.2d 644 (1965); Rubion Transfer & Storage Co. v. Louisiana Public Service Commission, 240 La. 440, 123 So.2d 880 (1960); Comment, The Scope of Judicial Review of Administrative Agencies in Louisiana, 33 Tul.L.Rev. 200, 205 (1958).
It is well settled that the carriers have a duty to adhere to the tariff sched *1123 ules and may not charge a different compensation than the applicable rates permit.[6] Despite the clear wording of the above language, the carriers attempted to charge a greater rate than is permissible under the rate schedules. The LPSC expounded on its order in a reply memorandum filed in the district court thusly:
“The Commission has merely held that a brand new rate, or a changed rate found in SWFB 2004 J is, by the wording of the tariff itself, not applicable to rates and charges on intrastate traffic until the railroads have published and been authorized to use that new or changed rate by letter-supplement.”
This record contains sufficient evidence upon which the Commission could reasonably conclude that only those ex parte increases approved by it would be computed into the interstate rate for purposes of rule 55-h. The language in Item 650 coupled with the exception repeated in each ex parte increase makes it clear that the increases will not apply to the interstate rate for intrastate transportation. Only those increases approved by the LPSC in letter-number supplements may be added to the base level under tariff SW 2004-J. Therefore, the Louisiana and Arkansas Railway Company and the Missouri Pacific Railroad Company erroneously computed the interstate rate when they included ex parte increases which had not been implemented by letter-number supplements on the date of shipment.
The order of the Louisiana Public Service Commission and the judgment of the district court are affirmed at appellants’ cost.
CALOGERO, J., concurs.
LEMMON, J., dissents.

. R.S. 45:1192 provides:
“If any of the persons, mentioned in R.S. 45:1191, or other party in interest, shall be dissatisfied with any order entered by the commission, adopting, fixing, changing, altering, or modifying, any rate, classification, rule, charge, or general regulation, the dissatisfied person may, within three months after the order made by the commission becomes effective, file in a court at the domicile of the commission, a petition setting forth the particular cause of objection to the order or regulation of the commis *1120 sion complained of. All such cases shall be tried in the same manner as civil cases and shall be given precedence over all other civil cases in the court, and shall be heard and determined as speedily as possible. The court may affirm the order of the commission complained of, or it may change, modify, alter, or set it aside, as justice may require.”

. The parties stipulated to the following increases and effective dates which are reproduced here in graph form for simplicity:

. Luria paid the freight bills at these levels: from May, 1977 to November 13, 1977, $11.87 NT under ex parte 313; from November 13, 1977 to February 22, 1978, $12.34 NT under ex parte 336-A; from February 22, 1978 to July 1, 1978, $12.96 NT under ex parte 330-A; from *1121 July 1, 1978 to September 1, 1978, $13.61 NT under ex parte 343; from September 1, 1978 to October 6, 1978, $13.35 NT under ex parte 349 (due to rollback).

. The carriers assert that this “lag time” between passage of an ex parte increase by the ICC and a correlative increase on intrastate rates by the LPSC is solely the fault of the Commission. While there is evidence in the record that the LPSC may be slow to act in certain situations, the record also indicates that the railroads often fail to request a letter-number supplement within a short time after ICC approval of the increase. It is up to the carriers to petition the LPSC for supplements; the agency will not raise the intrastate rates before it is asked to do so.

. The Commission recognized this policy in its order. It noted that rule 55-h is applied in instances such as the present case when the only applicable intrastate rate is a class rate.
“... Disparities in the level of rates occur in connection with Ex Parte General increases which generally are made effective on an interstate basis several months prior to the effective date or filing of an application for like increases on intrastate traffic.... ” Order No. T-14090.
The applicable intrastate rate is a class rate and the applicable interstate rate is a commodity rate. Commodity rates are generally lower than class rates; they are usually established when a shipper requests such a rate for a certain product from a carrier. Due to competition among various means of transport, the carrier may find it advantageous to seek a commodity rate from the regulatory body in order to be competitive for the shipper’s business. There is no commodity rate on file with the LPSC for scrap iron and steel; commodity rates do exist for caustic soda, pulpwood, sugar cane, and sand and gravel. The parties estimated that the class rate for scrap iron and steel would be $25.00 NT.

. The duty of a common carrier has been voiced as follows:
“... By virtue of the Interstate Commerce Act, common carriers have the duty to adhere to the tariff schedules and may not charge a greater or lesser or different compensation for the transportation of property than the rates applicable to such transportation as specified in such schedules. The rates named in the schedule become the legal rate for the services rendered and must be charged by the carrier and paid by the shipper or consignee without deviation therefrom....” Haskins Trucking Co. v. Lynn Lake Transportation Co., 350 So.2d 964, 966 (La.App.1977).